UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

CURTIS SIMONS,

                         Petitioner,          <u>MEMORANDUM AND ORDER</u>

        - against -                           Civil Action No.
                                              CV-00-2060 (DGT)
UNITED STATES OF AMERICA,

                         Respondent.

-------------------------------------------------- x

TRAGER, J.

     Curtis Simons ("Simons" or "movant") filed a motion pursuant
to 28 U.S.C. § 2255.  After a hearing was held, the motion was
denied for the reasons set forth at the hearing.  On appeal, the
Second Circuit remanded the case so that an opinion could be
issued addressing a number of claims that were not explicitly
decided at the hearing.  Subsequently, Simons also filed a
recusal motion.  For the following reasons, both the recusal
motion and the § 2255 motion are denied.


                            **Background**


     Using an informant named Frederico DeLima ("DeLima" or
"informant"), Trial Transcript ("Tr.") at 225, the government
conducted an undercover investigation into suspected cocaine
trafficking involving Glenia Ensermo ("Ensermo"), Andres Geson
("Geson"), Ensermo's son, and Simons, Tr. at 201.  In addition to

DeLima's cooperation[1], two federal officers, Special Agent William Klein ("S/A Klein") and Special Agent Richard Guerard ("S/A Guerard"), posed as potential couriers, who were supposedly recruited by DeLima.  Tr. at 283, 291.  Their role was to receive cocaine from Ensermo in Curacao, transport the cocaine into New York through John F. Kennedy Airport, Tr. at 308, 314-315, and then deliver the cocaine to Simons in Bermuda, Tr. at 213.

In August 1996, Simons and Geson were tried before a jury in federal court.  At trial, the prosecution called S/A Guerard and S/A Klein.  In addition to introducing an audio recording of a critical February 24, 1995 meeting between Ensermo, DeLima, Geson and S/A Klein (posing at the time as a courier), the prosecution also called Patricia Triana, who translated the portions of the recording that were in Spanish.  Tr. at 249-52.  At trial, Simons called three witnesses:  June Hamilton, Simons's mother, Laquita Simons, Simons's wife, and Bruce Simons, Simons's brother. Simons did not testify at trial and Geson called no witnesses in his defense.

---

[1]  The government paid DeLima $100,000 for "information" in this case and as a reward for "information that led to a seizure of almost one million dollars and the arrest for individuals in an unrelated case."  Tr. at 226.  DeLima also received $58,000 for expenses.  Id.

**a. The prosecution's case**

At trial, the government argued that Ensermo financed the operation and was to have supplied the cocaine. Tr. at 173. The government contended that Simons's role was to provide couriers and to ultimately distribute the cocaine inside Bermuda. Tr. at 173, 651. According to the government, DeLima's role was also to identify couriers. Tr. at 173.

Prior to trial, the government had determined that DeLima could no longer be used as an informant because of his involvement in various criminal activities. Tr. at 224. DeLima was eventually arrested, but he fled while on bail and did not testify at the trial. Tr. at 224-27. Therefore, the government was forced to present incomplete accounts of some of the meetings and conversations related to the alleged importation scheme. However, the evidence presented at trial, which is detailed below, firmly established Simons's role in the importation scheme.

On January 18, 1995, S/A Klein surveilled a meeting between DeLima and Simons at a restaurant in Manhattan. Tr. at 280. Upon arriving at the restaurant, DeLima walked up to Simons and "asked if his name was Steve." Tr. at 282. Simons "acknowledged he was Steve."[2] Id. After shaking hands, the two men began to

---

[2] Defense counsel stipulated that Simons used the name "Steve Simons" for "basically all of his life." Tr. at 232.

talk.  Id.  S/A Klein, who was seated across from the two at the
restaurant's bar, was only able to hear a portion of the
conversation where DeLima asked "[w]hen do you want to start?"
and Simons replied "[a]s soon as possible."  Id.  Simons then
handed DeLima a pamphlet and a piece of paper, which Simons had
written on.  Id.  After leaving the restaurant, DeLima drove
around in Simons's car for fifteen minutes before being dropped
off.  Tr. at 205-06.  DeLima, who had been searched prior to the
meeting, had the following items on his person when he was picked
up by federal agents:  (1) a white pamphlet, which had "Black
Family Productions" printed on the front; (2) a small scrap of
paper that had a telephone number on it; and (3) a blue napkin
containing $6,000.  Id.

On January 19, 1995, DeLima spoke to Ensermo over the
telephone.  Tr. at 207-208.  On February 23, 1995, a telephone
conversation took place between DeLima, Ensermo and Geson.  Tr.
at 214.  S/A Guerard listened in on both of these conversations;
however, the conversations were in Spanish, and, as S/A Guerard
could not understand Spanish, he was unable to testify to the
substance of the discussions at trial.  Tr. at 208, 214.

On February 1, 1995, S/A Guerard surveilled a meeting
between DeLima and Claudia Vanessa Ensermo ("Claudia Ensermo"),
the daughter of Ensermo.  Tr. at 208.  DeLima was meeting with
Claudia Ensermo in order to retrieve currency for an upcoming

trip to Curacao. Tr. at 209. After the meeting ended, DeLima handed $5,000 over to S/A Guerard; this money presumably came from Claudia Ensermo.[3] Tr. at 210.

On February 2, 1995, S/A Guerard surveilled another meeting between DeLima and Claudia Ensermo. Id. The two met in Queens and then traveled to a hotel in Manhattan. Tr. at 212. At the hotel, S/A Guerard overheard Claudia Ensermo ask a hotel attendant if Laquita Tuzo, Simons's then girlfriend and soon-to-be wife, Tr. at 516, had left her anything. Tr. at 212. The attendant replied that she did and then handed Claudia Ensermo a white plastic bag that apparently contained an article of clothing. Id. S/A Guerard then engaged Claudia Ensermo in a brief conversation in the elevator, where Claudia Ensermo confirmed that she was from Curacao.[4] Tr. at 213.

On February 24, 1995, S/A Klein met, for approximately thirty-five minutes, with Ensermo, Geson and DeLima at the Curacao Caribbean Hotel in Curacao. Tr. at 283-84. The meeting was recorded by S/A Klein, who was posing as one of two couriers

---

[3] The government argued at trial that the monies provided to DeLima by Simons and Claudia Ensermo were earmarked to pay the couriers. Tr. at 176-77.

[4] S/A Guerard's testimony about this incident appears to have been introduced to show a link between Simons and Claudia Ensermo. This testimony was ultimately rendered somewhat superfluous when the defense called Laquita Simons, who disputed that she left a bag for Claudia Ensermo at the hotel, but admitted being friendly with Claudia Ensermo and visiting her at the hotel in February 1995. Tr. at 530-32.

that had been recruited by DeLima to meet with Ensermo and Geson.[5] Tr. at 283. The meeting was conducted in both Spanish and English. Tr. at 285. After the jury listened to the tape of the meeting, S/A Klein was permitted to explain his understanding of the various exchanges that occurred between the participants. Tr. at 291.

During a number of points in the meeting, it becomes clear, despite no explicit references to "cocaine" or "drugs," that the participants were discussing the importation of drugs. S/A Klein and Ensermo discussed how the couriers would be outfitted with the cocaine, as well as the procedure for picking up the cocaine before departing for New York. Feb. 24, 1995 Tr. at 7-8; Tr. at 296-97, 305, 307. S/A Klein mentioned to Ensermo that he and S/A Guerard would not be profiled upon returning to the United States because they were both white. Feb. 24, 1995 Tr. at 19; Tr. at 304. At the meeting, Ensermo also indicated that, after having the opportunity to meet S/A Klein face-to-face, she approved of him as a courier. Feb. 24, 1994 Tr. at 3; Tr. at 310. At one point, Ensermo noted "this is dangerous work. You have to be careful." Feb. 24, 1995 Tr. at 34. At another point during the meeting, Ensermo even referenced the money given to DeLima by Claudia Ensermo, stating "I sent all the money with Vanessa to

---

[5]  S/A Guerard, who was posing as the other courier, did not attend this meeting because he was surveilling the meeting from afar with another agent. Tr. at 216.

give to [DeLima]."  Feb. 24, 1995 Tr. at 35.

In addition, Simons was referenced numerous times throughout the meeting.  At one point, S/A Klein mentioned that "we [referring to S/A Klein and DeLima] talked to the guy in Bermuda yesterday."  Feb. 24, 1995 Tr. at 3.  At trial, S/A Klein testified that this referred to Simons.  Tr. at 292.  Later during the meeting, some apparent confusion over Simons's role in financing and paying the couriers prompted Ensermo to state that "[w]e financed it [U/I][6] it didn't belong to him, it belonged to us and [U/I].  This guy didn't finance it, you know."  Feb. 24, 1995 Tr. at 5; Tr. at 293.  At trial, S/A Klein explained that Ensermo was "referring to Mr. Simons" and that she was claiming that the money at issue was not Simons's.  Tr. at 293-94.  Just prior to this exchange, Ensermo referenced the individual identified by S/A Klein as "the guy in Bermuda" and stated that she spoke with him over the telephone in order to resolve an outstanding issue concerning the transaction.  Feb. 24, 1995 Tr. at 9.  At another point during the meeting, Ensermo stated that "we've worked with him many years without a problem [U/I] ten years ago."  Feb. 24, 1995 Tr. at 6.  At trial, S/A Klein interpreted this conversation to mean that Ensermo had worked

---

[6]  "[U/I]" refers to unintelligible portions of the recording.  Working from the audio recording S/A Klein prepared a transcript of the meeting, certain parts of which were marked unintelligible.  Tr. at 292-93.

with Simons for ten years without being caught. Tr. at 295-96, 301. Finally, during a discussion about the money that was to be paid to the couriers and the various hurdles that the couriers had to overcome in becoming part of the transaction, Ensermo remarked "[t]hat's Steven." Feb. 24, 1995 Tr. at 30.

The couriers were scheduled to fly out of Curacao on February 26, 1995, two days after the meeting at the hotel. Two hours before their flight, Ensermo was supposed to call the couriers, who would then travel to her home to be outfitted with the cocaine. Tr. at 384. Ensermo, however, never contacted the couriers. Id. After repeated attempts to contact her, S/A Klein and S/A Guerard left Curacao on February 26th without any cocaine on their persons. Tr. at 385.

On February 27, 1995, S/A Klein, in an effort to determine why the transaction did not occur, had DeLima call Simons; S/A Klein listened in on that call.[7] Tr. at 386-87. At the beginning of the call, the other party on the line acknowledged that his name was Steve. Tr. at 387. DeLima then "told [Simons] that he was back in New York and did not have the product" and asked "Simons if he had spoken to Glenia Ensermo." Tr. at 388. Simons "said yes, he had." DeLima then said "that the deal didn't go" and "that Glenia didn't have it ready." Id. Simons

---

[7] Although S/A Klein's attempt to record the conversation failed, Tr. at 387, S/A Klein testified about the substance of the conversation at trial.

responded with "words to the effect oh, well, these things happen." <u>Id.</u> Simons then "asked [DeLima] if he had any of the money left." <u>Id.</u> When DeLima responded that he had spent it all, Simons stated that "well, perhaps we can work again in the future," and reminded DeLima that they had each other's telephone numbers. Tr. at 388-89. At trial, S/A Klein testified he understood this conversation to be referring to the cocaine that was to have been transported out of Curacao. Tr. at 475-76.

On May 22, 1995, Simons was arrested at a hotel in Manhattan. Tr. at 219. At the time of his arrest, Simons denied being involved in any drug deals with Ensermo. Tr. at 416. When asked to consent to a search of the room's safe, Simons refused, stating "there's nothing illegal in there. It's just money." Tr. at 476, 481. Simons then stated that he wanted a lawyer. Tr. at 476. No contraband was found in Simon's hotel room. Tr. at 238. Agents did, however, recover $20,000 in cash; $7,000 was found in the room and another $13,000 was later recovered from the hotel safe.[8] Tr. at 419. The agents also recovered other items including business cards, credit cards, insurance certificates, plane tickets to Curacao, Simons's passport and a number of pamphlets for "Black Family Entertainment Productions." Tr. at 238-39, 420-23.

_____

[8] It must be noted that this point was elicited by Simons's trial counsel, James Druker ("Druker") during the cross-examination of S/A Klein. <u>Id.</u> at 419.

**b.  The defense case**

The defense conceded that Ensermo was a drug dealer, Tr. at
186, but stressed that Ensermo also had a number of legitimate
businesses involving entertainment, clothing, shoes and leather
goods.  Id.  The defense argued that Simons's entertainment
business, "Black Family Productions," Tr. at 187, had previously
conducted legitimate business dealings with Ensermo and that
Simons believed that he was conducting another legitimate
transaction with Ensermo, Tr. at 693.  To support this argument,
the defense maintained that DeLima deceived the government about
the purpose of the money that Simons gave him.  Tr. at 680, 694.
The defense also focused on the fact that Simons gave DeLima a
pamphlet for Black Family Productions, suggesting that Simons was
engaging in what he believed to be a legitimate business
transaction.  Tr. at 688.  In attacking the government's theory
that Simons was supposed to identify the couriers, the defense
pointed out that Simons never even with met the couriers.  Tr. at
691.

All three defense witnesses detailed the family's numerous
social contacts with Ensermo and Ensermo's family, including
Claudia Ensermo.  Tr. at 501, 504, 522-23, 531.  Laquita Simons,
movant's wife, and Bruce Simons, his brother, explained the
operations of Black Family Productions, the entertainment company
that they ran with Simons in Bermuda.  Tr. at 517-18, 525-529,

587-89.  Laquita Simons and Bruce Simons also detailed the
purchase of leather goods from Ensermo, as well as jewelry
samples that Ensermo provided.  Tr. at 523-24, 549, 557, 597,
608.  Bruce Simons testified that in addition to Black Family
Productions, he and his brother ran games of chance during "Crown
and Anchor," a holiday in Bermuda.  Tr. at 591-92.

Although the defense witnesses established the existence of
Black Family Productions and testified to prior, apparently
legitimate transactions with Ensermo, neither Laquita Simons nor
Bruce Simons attempted to provide an explanation for the $6,000
DeLima received from Simons.  Moreover, there were discrepancies
in the testimony provided by these three witnesses.  Critically,
Bruce Simons's account of how he first met Ensermo made little
sense in light of Laquita Simons's testimony about her first
meeting with Ensermo.  Tr. at 741-42.  Laquita Simons testified
that she first met Ensermo, by chance, on a beach with movant in
1992.  Tr. at 518-19.  Bruce Simons explained that he first met
Ensermo on a trip in 1993 when he "ran into her by chance" at the
hotel where he was staying.  Tr. at 594.  According to Bruce
Simons, Ensermo never mentioned to him that she knew his brother.
This sequence of coincidences was, to say the least,
implausible.[9]

---

[9]  It should be noted that in an affidavit filed by Simons's
trial counsel, James Druker ("Druker"), in response to Simon's
§ 2255 motion, which claims that Druker was ineffective, Druker

## c. Appellate and post-conviction proceedings

Simons was convicted of conspiracy and attempt to import

cocaine in violation of 21 U.S.C. § 963.  He was sentenced to 121

months imprisonment.  On appeal, the Second Circuit affirmed

Simons's conviction, but remanded the matter on a sentencing

issue.  United States v. Simons, No. 96-1730, 1997 WL 701369

(2d Cir. Nov. 10, 1997).  On re-sentencing, Simons received a

term of ninety-seven months.  Simons's appeal of that sentence

was denied.  United States v. Ensermo, No. 98-1149, 1998 WL

870209 (2d Cir. Dec. 11, 1998).  Simons filed two petitions for

writs of certiorari, both of which were denied.

On April 3, 2000, Simons filed a motion pursuant to 28

U.S.C. § 2255, raising four claims.  First, he argues that he

---

explained that Bruce Simons's testimony at trial was inconsistent
with the story he had told Druker before trial.  According to
Druker, Bruce Simons told him "that he and Curtis had first
discussed [Ensermo] at Bruce's retirement party from the United
States Navy."  Aff. of James O. Druker ("Druker Aff.") ¶ 4.
Bruce Simons also told Druker he traveled to Curacao with full
knowledge that he was to meet Ensermo there.  Id.  In describing
Bruce Simons's trial testimony, Druker stated that "n[o] one in
the courtroom was more surprised than I when Mr. Simons told a
totally different story on his direct examination."  Druker Aff.
¶ 8.  Druker added that "[n]ot only was his testimony, in my
view, completely contrary to the truth, but it was patently
incredible on its face and greatly served to undermine his
brother's cause."  Druker Aff. ¶ 5.  When Druker confronted Bruce
Simons about this testimony, he "admitted that he had deviated
from the truth because he was afraid that it would inculpate
Curtis if he (Bruce) testified that Curtis had a pre-existing
business relationship with Ensermo, and that Curtis had told
Bruce about that relationship at Bruce's retirement party."
Druker Aff. ¶ 9.

received ineffective assistance of trial counsel, pointing to
eleven alleged violations, which are detailed _infra_.  Second,
Simons maintains that his Fifth and Sixth Amendment rights were
violated when S/A Klein was permitted to testify that Simons
declined to consent to a search and requested a lawyer.  Third,
Simons argues that portions of S/A Klein's testimony violated his
rights under the Confrontation Clause.  Fourth, Simons advances a
general due process claim.  On September 6, 2000, Simons amended
his motion to include a claim that his conviction violated
_Apprendi v. New Jersey_, 530 U.S. 466 (2000).

In response to Simons's claims, Simons's trial counsel,
James Druker ("Druker"), filed an affidavit explaining his trial
decisions and strategy.  On June 11, 2001, a hearing was held
("Hearing") at which both Simons and Druker testified.  Prior to
the witnesses taking the stand, a number of the ineffective
assistance claims were dismissed.  As discussed _infra_, I
concluded that a number of counsel's decisions at trial were
legitimate trial strategy.  Additionally, Simons's § 2255 counsel
explicitly withdrew two ineffective assistance claims at the
Hearing.  At the conclusion of the Hearing, Simons's claims that
Druker failed to advise Simons of his right to testify at trial
and that Druker failed to inquire into the basis of certain
statements made by S/A Klein were both denied.  June 11, 2002
Hearing Transcript ("H.") at 100-02.  At the Hearing, Simons's

13

claims that were unrelated to his ineffective assistance argument were not explicitly addressed, nor were the other ineffective assistance issues raised by Simons explicitly ruled on. On June 13, 2001, an order was entered dismissing the § 2255 motion "for the reasons stated" during the Hearing.

Before the Second Circuit, Simons filed an appeal and a motion seeking to have me recused. On February 6, 2003, the Second Circuit issued a mandate remanding the case "[b]ecause the district court's opinion did not address four of the claims raised by Simons's habeas petition, nor five of the sub-points raised within his claim of ineffective assistance of counsel." The Second Circuit directed that an opinion be issued addressing these remaining claims. Furthermore, the Second Circuit instructed Simons that "if he wishes to raise the district court's alleged impartiality as an issue on appeal, he must move in the district court for the judge's recusal pursuant to 28 U.S.C. § 455." Subsequently, Simons filed a motion for recusal with this court. On January 1, 2006, he also filed a motion to vacate his sentence and conviction in light of United States v. Booker, 543 U.S. 220 (2005).

## Discussion

### (1)

### Motion for Recusal

Simons argues that 28 U.S.C. § 455 required me to <u>sua sponte</u> recuse myself.

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

28 U.S.C. § 455.

As an initial matter, the government argues that the recusal motion is untimely. <u>See</u> <u>United States v. Brinkworth</u>, 68 F.3d 633, 639 (2d Cir. 1995) (noting that "[a]lthough § 455 does not specify a time limit for application, a timeliness provision has been judicially implied"). According to the government, Simons first filed this motion on June 6, 2002, almost a year after Simons's § 2255 motion was denied. It is unclear from the record exactly when Simons first submitted his recusal motion, which was initially filed in the Court of Appeals. Because Simons's motion fails on the merits, it is unnecessary to resolve the question of

timeliness.[10]

Turning to the merits, Simons argues that my relationship
with Druker mandated recusal under § 455(a).  As the Second
Circuit has explained:

> Section 455(a) requires a showing that would cause
> an objective, disinterested observer fully informed
> of the underlying facts [to] entertain significant
> doubt that justice would be done absent recusal.
> Where a case . . . involves remote, contingent,
> indirect or speculative interests, disqualification
> is not required.  Moreover, where the standards
> governing disqualification have not been met,
> disqualification is not optional; rather, it is
> prohibited.

Aquinda v. Texaco, 241 F.3d 194, 201 (2d Cir. 2001) (internal
quotation marks and citations omitted).

Simons alleges that Druker and I have a mentor-protégé
relationship because I supervised and promoted Druker when I was
United States Attorney for the Eastern District of New York, a
position I held from 1974 to 1978.  Druker served in that same
office from 1975 until 1976.  Lawyers.com, http://www.lawyers.com
/New-York/Garden-City/Kase-and-Druker-419145-f.html (last visited
on June 28, 2007).  During his tenure, he was promoted to Deputy

_____

[10]  It bears mentioning, however, that, to the extent
Simons's motion argues that I should have recused myself from
this § 2255 proceeding based on conduct during his criminal trial
(in contrast to actions at the Hearing), those claims are clearly
untimely.  See Brinkworth, 68 F.3d at 639 ("A party must bring a
disqualification motion 'at the earliest possible moment after
obtaining knowledge of facts demonstrating the basis for such a
claim.'") (quoting Apple v. Jewish Hosp., 829 F.2d 326, 333 (2d
Cir. 1987)).  The only possible relevance of the conduct at trial
is insofar as it may support a claim of bias at the Hearing.

16

Chief of the Criminal Division and Chief of the Official

Corruption Section.  Id.  My relationship with Druker has always

been strictly professional; I have never maintained a personal or

social relationship with him.  This professional relationship,

which ended almost twenty years prior to Simons's trial, is

insufficient to warrant my recusal from this matter.[11]  See Riola

v. Long Island Cycle & Marine, Inc., 352 F. Supp. 2d 365

(E.D.N.Y. 2005) (denying recusal motion where magistrate judge

had served in the United States Attorney's Office with counsel

ten years prior, had occasionally participated in the same social

events while colleagues and had "rare" contact in the intervening

ten years); see also United States v. Lovaglia, 954 F.2d 811,

814-17 (2d Cir. 1992) (denying recusal motion where judge had

been "very close socially" with owners of corporations victimized

by defendants, but relationship had ended seven years prior to

trial); United States v. Peel, No. 06-CR-30049, 2006 WL 1388864,

at *3 (S.D. Ill. May 18, 2006) (noting that "the mere fact that a

judge was once a boss of a litigant is insufficient to warrant

recusal").  My relationship with Druker is not comparable to

situations where recusal may be required under § 455(a).  See

United States v. Murphy, 768 F.2d 1518, 1536-41 (7th Cir. 1985)

---

[11]  It must be noted that Simons's argument on this point
is somewhat disingenuous because if I was, in any way, biased
towards Druker, then Simons would likely have received the
benefit of that bias during trial, when he was represented by
Druker.

(suggesting that the standard for recusal under § 455(a) may have been met where trial judge and prosecutor had previously worked in the United States Attorney's Office together, were the "best of friends" and vacationed together immediately after sentencing, but ultimately not reaching this question because there were no further proceedings before the trial judge and the circumstances did not warrant invalidating any of the rulings made by the trial judge prior to the filing of the recusal motion).[12]

Furthermore, Simons's argument for recusal based on Druker's prior relationship with me would logically require my recusal in any number of cases where defense counsel were former assistant U.S. attorneys who were appointed by me to supervisory positions, even when they had been promoted years, and even decades, earlier. Incidentally, this is not an insignificant number of attorneys.

Simons also implies that because I expressed a personal view

---

[12] In reaching this conclusion, I am mindful that Druker appeared at the Hearing under somewhat unique circumstances. Although Druker, who appeared at the Hearing as a witness and not as counsel, was not technically a party, his reputation was at stake and he might be exposed to subsequent civil liability if his representation were found to be constitutionally deficient. See United States v. Levy, 377 F.3d 259, 265 (2d Cir. 2004) (noting that "[g]enerally, in the context of ineffective assistance claims, attorney affidavits cannot be said to be completely unbiased - attorneys understandably have an interest in maintaining their reputations and avoiding civil liability."). Nonetheless, Druker's interest in protecting his professional reputation is not a basis for my recusal in light of the limited and professional nature of our relationship.

18

on the wisdom of certain circuit law that I could not faithfully

apply that law.  Simons argues that under those circumstances, my

impartiality could reasonably be questioned.  In support, he

points to a number of comments made at the Hearing:

> Mr. Davis [attorney for the government]:  Your
> Honor, if that's the case, then any defendant who
> wishes to indicate he would have testified
> perjuriously has an ineffectiveness claim if he
> would have perjured himself.
>
> The Court:  I am trying to follow 2d Circuit law.
> I also think its ridiculous.  A lawyer gives good
> advice -- that's why some defense lawyers I know
> tell me in order to protect themselves they have
> their clients sign letters.  It is unfortunate.
> What seems like wonderful rules to protect
> defendants, what appellate courts come up with
> undermine the attorney-client relationship and make
> it adversarial from day one.

H. at 12.

As an initial matter, it is important to note that the

comments were in response to the government's hypothetical, which

attempted to show that the law in this area could potentially

lead to absurd results.  Moreover, the fact that I expressed

personal views about the law did not mean that I was unable to

apply that law faithfully or that I was biased against Simons's

claim.  See Moore v. McGraw Edison Co., 804 F.2d 1026, 1032 (8th

Cir. 1986) (claim that trial court harbored a bias against

circuit court decision did not warrant recusal where "nothing in

the record [suggested] that the court did anything but follow the

law as set out [in the court of appeals' decision at issue]");

Johnson v. Citizens Bank & Trust Co. of Flippin, Ark., 659 F.2d
865, 869 (8th Cir. 1981) (holding trial court's remark that
Arkansas usury law was "harsh" and amounted to a "gift" did not
warrant recusal as the "the judge merely expressed a viewpoint
concerning a legal issue"). Cf. LeBlanc-Sternberg v. Fletcher, 9
F. Supp. 2d 397, 404-05 (S.D.N.Y. 1996) (trial judge requested
reassignment of case to another judge because trial judge so
"vigorously disagreed" with the Second Circuit's legal
conclusions and fact-finding that he could not comply with the
court of appeals' directives).

Simons also relies on the following statement of mine: "I'm
very troubled by the notion that someone can just come up and
make a claim that the lawyer didn't tell him he had a right to
testify and the burden somehow shifted to the lawyer." H. at 32.
This statement is not even critical of existing law, which
ordinarily places the burden of proof on habeas petitioners to
prove their claims by a preponderance of the evidence. Bellezza
v. Fischer, No. 01-CV-144, 2003 WL 21854749, at *10 (E.D.N.Y.
Aug. 6, 2003) (citing Harned v. Henderson, 588 F.2d 12, 22 (2d
Cir. 1978), a pre-AEDPA case, and noting that "[n]othing in the
AEDPA revisions changes this burden"). The comment was simply
dispelling any notion that Simons's testimony stating that Druker
failed to inform him of his right to testify would, somehow,
shift the burden to Druker (or the government) to show otherwise.

20

Simons also relies on the following statement: "Nevertheless, these are the rules that somehow counsel has to, you know, has got to tell the defendant he had an absolute right to testify despite going through all the reasons not to. I mean, sounds wacky to me, but that's the way it is." H. at 35. This comment, which merely expressed an opinion of the law and evinced no prejudice towards Simons, was made in the context of a <u>denial</u> of the government's request that all of the issues be disposed of based solely on Druker's affidavit and without the benefit of Druker's testimony.

Simons also alleges that at the first sentencing hearing, I stated, "[w]ell, at least you didn't perjure yourself." The actual exchange, which concerned Simons's refusal to admit guilt in order to qualify for safety valve relief, took place as follows:

> Mr. Druker: Yes. I think without question, if Mr. Simons had testified at trial and told an exculpatory story, that it would be at least implicit in the jury verdict they rejected that story and we wouldn't have that.
>     This didn't occur here. Basically he has never taken a position contrary to what the government's evidence is.
>
> The Court: It's true he's never committed perjury.
>
> Mr. Druker: Yes.
>
> The Court: That's not the issue. The issue is if I accept this letter as his version of the facts, how can you reconcile that letter with the verdict?

H. at 2-3.

Simons had submitted a letter regarding sentencing in which he denied all responsibility for the crimes at issue. The quoted statement, which did not on its face evince bias towards Simons, was simply confirming Druker's statement that Simons had never taken a contrary position at trial.

Simons also argues that recusal was required under § 455(b) because I had a personal bias against him. In support of this claim, he points to a number of rulings that were adverse to him. For example, he maintains that he was not allowed to introduce certain exculpatory tape recordings and transcripts into evidence during the Hearing. He also notes that I credited Druker's testimony during the Hearing on the question of whether Simons was advised of his right to testify on his own behalf. These claims are meritless. As discussed earlier, my relationship with Druker does not warrant recusal. The fact that certain rulings were adverse to Simons, and "in favor" of Druker, does not alter that conclusion. Moreover, "[j]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." United States v. Liteky, 510 U.S. 540, 555 (1994). See also Jones v. Hirschfeld, 348 F. Supp. 2d 50, 57 (S.D.N.Y. 2004) ("Absent extreme circumstances, a judge's rulings or expressions of opinion generally fail to justify recusal.").

Finally, Simons argues that my "predetermination of [his] culpability" was

> apparent through inflections and gestures during
> the course of these proceedings, as is documented
> by petitioner in his letter to the court dated
> October 10, 1996. This behavior, which was
> craftily conspicuous and persuasive to the jury,
> was either not recognized or ignored, and
> consequently not placed on the record by trial
> counsel James O. Druker.

Movant's Motion for Recusal at 25. Simons's October 10, 1996

letter, however, states only that "[i]t became clear to me as I

listened to Judge Trager argue with the lawyers that he believed

I was guilty, which also disappointed me greatly." Simons's Oct.

10, 1996 letter at 3. Simons's claim is meritless. The October

10, 1996 letter fails to identify any "inflections [or] gestures"

made by me. Cf. Willner v. Univ. of Kansas, 848 F.2d 1023, 1026-

27 (10th Cir. 1988) (upholding denial of recusal motion where

plaintiff alleged that the trial judge's demeanor during a trial

involving plaintiff's sister, over which the trial judge also

presided, was evidence of bias).[13]

---

[13] Moreover, the allegations made in the letter, even if
true, would not warrant recusal. See Liteky, 510 U.S. at 555
(stating that unless the comments at issue "reveal such a high
degree of favoritism or antagonism as to make fair judgment
impossible," judicial remarks "that are critical or disapproving
of, or even hostile to, counsel, the parties, or their cases,
ordinarily do not support a bias or partiality challenge").

## § 2255 Issues

### a.  Ineffective assistance of counsel

In order to prevail on a Sixth Amendment ineffectiveness claim, a defendant must prove (1) that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id.</u> at 694. "[S]trategic choices made by counsel after thorough investigation . . . are virtually unchallengeable," and there is a strong presumption that counsel's performance falls "within the wide range of reasonable professional assistance."  <u>Id.</u> at 689-90.

The second prong of the <u>Strickland</u> test requires the court to determine whether, but for counsel's deficient performance, "there is a reasonable probability that . . . the result of the proceeding would have been different," 466 U.S. at 694, for an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," <u>id.</u> at 691.  A defendant must show more than that the unprofessional performance merely "had some conceivable effect." <u>Id.</u> at 693.  To satisfy the "reasonable probability" test, however, "a defendant need not

show that counsel's deficient conduct more likely than not altered the outcome in the case." <u>Id.</u>

Simons's first claim maintains that Druker failed to object to certain portions of S/A Klein's testimony. Movant's Sept. 11, 2000 Mem. Supporting Amended § 2555 Petition ("Movant's Mem.") at 16. Simons refers to portions of S/A Klein's re-direct examination, where S/A Klein related that Simons: (a) asserted that the hotel safe only contained currency; (b) declined to consent to a search of the safe (from which $13,000 was recovered); and (c) asked for a lawyer. At the Hearing, I concluded that the decisions at issue constituted legitimate trial strategy.[14]  H. at 23-24.

Simons's second claim alleges that Druker was ineffective in eliciting from S/A Klein the fact that agents seized $20,000 in cash from defendant at the time of his arrest. Movant's Mem. at 17. At the Hearing, I also rejected this claim, concluding that it constituted legitimate trial strategy. H. at 23-24.

Simons's third claim maintains that Druker failed to

---

[14]  Even if defense counsel had objected to S/A Klein's testimony regarding Simons's request for a lawyer and refusal to consent to a search, it would not have affected the outcome of the trial. At most, Simons would have received a curative instruction, given that the prosecutor only raised this issue once on re-direct examination and never referred to this testimony during summation. Based on the strength of the case against Simons, which is discussed <u>infra</u>, it is not reasonably probable that the jury's verdict would have been different absent the disputed testimony.

properly prepare Bruce Simons's testimony. Movant's Mem. at 18.
This claim was withdrawn at the Hearing. H. at 6 ("We're not
pursuing that claim. . . . We are withdrawing that claim.").

Simons's fourth claim is that Druker erred in allowing S/A
Guerard to testify that DeLima, the government informant, had
been paid $100,000 for information in an unrelated matter that
lead to a seizure of almost one million dollars and four arrests.
Movant's Mem. at 20. At the Hearing, I concluded that this was a
"legitimate trial strategy." H. at 25.

Simons's fifth claim alleges that Druker failed to object
during the cross-examination of Laquita Simons when the
government asked her about a police report that implied she was
involved in money-laundering while working at a bank in Bermuda.
Movant's Mem. at 21. At trial, the following exchange occurred:

> Q:  Was there not in fact a police report filed in
> connection with your working at the Bank of
> Butterfield?
>
> A:  Not that I know of.
>
> Q:  Was it not in fact the reason that you left
> that in fact you were accused of laundering money
> in connection with your capacity as an
> administrator of the Bank of Butterfield?
>
> A:  No.

Tr. at 543-44.

At the Hearing, Simons's counsel explicitly waived this
claim. H. at 71. This claim also fails on the merits. Any
objection to the prosecutor's line of questioning would have been

denied.  Fed. R. Evid. 608(b)[15], upon which Simons relies, is
inapplicable, as the prosecutor never attempted to introduce any
extrinsic evidence to impeach Laquita Simons's denial of any
wrongdoing.[16]

Simons's sixth claim maintains that Druker failed to
properly examine S/A Klein's basis for his interpretations of
various statements made during the February 24, 1995 meeting.
Movant's Mem. at 22.  Simons alleges that this inquiry would have

---

[15]  Rule 608(b), entitled "Specific instances of conduct."
reads in relevant part:

> Specific instances of the conduct of a witness, for
> the purpose of attacking or supporting the witness'
> character for truthfulness, other than conviction
> of crime as provided in rule 609, may not be proved
> by extrinsic evidence.

(Emphasis added).

[16] Even if it was inappropriate for the prosecutor to
inquire into this matter in order to show Laquita Simons's
character for untruthfulness, the questioning likely still would
have been allowed for the purpose of impeaching Laquita Simons's
earlier testimony on cross-examination that she only left her
position at the bank because she did not get a promotion and did
not have enough time to devote to Black Family Productions while
also working at the bank, Tr. at 543.  See Fed. R. Evid. 608
advisory committee's notes (2003) ("By limiting the application
of the Rule to proof of a witness' character for truthfulness,
the amendment leaves the admissibility of extrinsic evidence
offered for other grounds of impeachment (such as contradiction,
prior inconsistent statement, bias and mental capacity) to Rules
402 and 403.") (emphasis added).

Moreover, the exclusion of this line of questioning or a
curative instruction would have had little, if any, effect as
Laquita Simons's testimony did not clearly exonerate Simons, the
government's evidence implicated Simons and Bruce Simons's
testimony seriously undercut the alibi put forth by the defense.

revealed that S/A Klein's understanding of the conversations was based on hearsay information from DeLima. This claim was denied at the Hearing. H. at 102. The explanation given was as follows:

> The Court: Now, with respect to the minor issue
> that he didn't exactly bring out what everything
> the agent said was based on, you know, what the
> fugitive said, it wouldn't have added very much.
> There was still the tape of the conversation itself
> and even if the client said yes, I understood it
> was based on what was his name, the fugitive,
> whatever his name was.
>
> Mr. Davis: Mr. DeLima, your Honor.
>
> The Court: There was still incriminating tone to
> the conversation by Mrs. Anselmo [sic], her son --
> it is coming back to me, the business about how you
> should dress, you know, and now all they needed was
> a little bit of corroborating which they got in the
> context of Mr. Klein's testimony about that
> conversation he overheard with the defendant plus
> the disaster in terms of what happened when, you
> know, Bruce testified. I feel very bad, but the
> reality is I just don't credit this claim here.

H. at 102.

Simons's seventh claim alleges that Druker failed to elicit, during S/A Klein's cross-examination, the fact that DeLima was the individual who informed S/A Klein that he could expect to receive $5,000 when he arrived in Curacao.[17] Movant's Mem. at 7.

---

[17] During S/A Klein's direct examination, the following exchange occurred:

> Q: At any time during this conversation [at the February
> 24, 1995 meeting], any other conversation, was there any
> discussion of the amount of money that was explained to
> you as owing, once you arrived in Curacao?

Simons maintains that this fact would have rendered S/A Klein's testimony about the $5,000 inadmissible. As this claim is almost identical to Simons's sixth claim, the rejection of Simons's sixth claim at the Hearing is equally applicable to this claim. H. at 102. Moreover, it is highly unlikely that this testimony affected the outcome of the trial, given the other evidence implicating Simons.[18] It should also be noted that habeas counsel waived this issue when he failed to question Druker about this issue during the Hearing.

Simons's eighth claim alleges that Druker failed to request a instruction that S/A Klein's statements during the February 24, 1995 meeting were admissible only to provide context to the statements of Ensermo and Geson and were not admissible for the truth of the matters asserted in S/A Klein's statements.[19] Movant's Mem. at 24. Habeas counsel never questioned Druker

---

A: Yes.

Q: How much was that?

A: Prior to, I believe it was five thousand.

Tr. at 294.

[18] It should be noted that on direct appeal, the Second Circuit stated that "[t]he evidence of Simons' guilt, while not overwhelming, was nonetheless substantial." Simons, 1997 WL 701369, at *3.

[19] Geson's counsel requested and received a similar instruction concerning statements made by DeLima during the February 24, 1995 meeting. Tr. at 372, 376-77.

about this issue and never inquired as to why Druker did not request this instruction. As such, this issue was waived.

On the merits, the reasoning behind the denial of petitioner's sixth claim at the Hearing is equally applicable here. H. at 102. As was explained at the Hearing, there was ample incriminating evidence other than S/A Klein's disputed statements. H. at 102. Furthermore, even if the instruction at issue had been given, limiting the purpose for which the jury could consider S/A Klein's statements, there were numerous admissible statements made by Ensermo herself that implicated Simons. Those recorded statements were corroborated by Simons's meeting with DeLima and telephone conversation with DeLima. And, as noted previously, Bruce Simons's testimony undercut the credibility of movant's alibi, which did not even fully explain movant's interactions with DeLima. Under those circumstances, Simons could not have been prejudiced by the absence of the requested instruction regarding S/A Klein's testimony.

Simons's ninth claim maintains that Druker failed to sufficiently cross-examine S/A Klein about the February 27, 1995 telephone conversation between Simons and DeLima. Movant's Mem. at 25. Simons argues that S/A Klein was unable to independently confirm that Simons was the individual speaking to DeLima. This claim is utterly devoid of merit. S/A Klein testified that the other party on the line acknowledged that his name was Steve.

Tr. at 387.  At trial, Simons stipulated that he used the name

"Steve Simons" for "basically all of his life."  Tr. at 232.  The

only reasonable inference in this situation is that Simons was

the other party to the phone call.  It should also be noted that,

on direct appeal, the Second Circuit rejected Simons's contention

that S/A Klein's identification of Simons's voice should not have

been admitted at trial.  <u>Simons</u>, No. 96-1730, 1997 WL 701369,

at *2.

Simons's tenth claim is that Druker failed to advise him

that he had an absolute right to testify.  Movant's Mem. at 27.

This claim was denied at the Hearing.  H. at 99-102

Simons's eleventh claim is that Druker failed to present

sufficient documentary evidence in support of Simons's defense

that he had legitimate business dealings with Ensermo.  Movant's

Mem. at 28.  Habeas counsel did not question Druker about this

issue during the Hearing, waiving this claim.  Moreover, this

claim fails on the merits.  At trial, both Bruce Simons and

Laquita Simons testified that Laquita Simons had purchased

leather key chains from Ensermo in November 1994 for Black Family

Productions.  Tr. at 523-24, 549, 552-58, 597, 608, 638.  At

Simons's first sentencing hearing, Druker referred to evidence of

two other leather goods transactions with Ensermo, which were not

presented at trial.  Oct. 18, 1996 Sentencing Hearing Tr. at 12.

Even assuming that the evidence of these transactions would have

been more credible than the evidence of the key chain purchase, there is not a reasonable probability that this "new" evidence would have altered the jury's verdict. The strength of the case against Simons has already been discussed above. Moreover, even if there were prior legitimate transactions with Ensermo, they would not explain Simons's conduct during the instant transaction. Handing over $6,000 cash wrapped in a napkin does not suggest a legitimate business deal. More importantly, the fact that Simons lodged no objection when DeLima informed him on February 27, 1995 that he no longer had any of the $6,000 Simons had given him makes little sense if Simons believed that he was engaged in a legitimate business transaction with DeLima and Ensermo. See Oct. 18, 1996 Sentencing Hearing Tr. at 15 (noting the implausibility of a legitimate reason for this conduct). As such, there is not a reasonable probability that evidence of additional legitimate transactions would have affected the jury's verdict.

Finally, Simons's claim that Druker's actions at trial, when taken in the aggregate, deprived him of ineffective assistance of counsel is, in light of the above discussion, meritless.

**b. Other claims**

In addition to the claims of ineffective assistance of counsel discussed above, movant raises a number of other

32

arguments, all of which are meritless.

Simons argues that his conviction violated <u>Apprendi v. New
Jersey</u>, 530 U.S. 466 (2000). He is barred from raising an
<u>Apprendi</u> challenge as <u>Apprendi</u> "does not apply retroactively to
initial section 2255 motions for habeas relief." <u>Coleman v.
United States</u>, 329 F.3d 77, 90 (2d Cir. 2003). Simons's claim
based on <u>United States v. Booker</u>, 543 U.S. 220 (2005), which was
raised in his most recent motion is similarly barred. <u>See</u> <u>Green
v. United States</u>, 397 F.3d 101, 103 (2d Cir. 2005) (holding that
<u>Booker</u> is not retroactive to cases on collateral review).[20]

Simons raises three other claims regarding alleged
constitutional violations, none of which were raised on direct
appeal. "Where a criminal defendant has procedurally forfeited
his claim by failing to raise it on direct review, the claim may
be raised in a § 2255 motion only if the defendant can
demonstrate either: (1) 'cause for failing to raise the issue,
and prejudice resulting therefrom,' or (2) 'actual innocence.'"
<u>Rosario v. United States</u>, 164 F.3d 729, 732 (2d Cir.
1998)(citations omitted). <u>See also</u> <u>Massaro v. United States</u>, 538

---

[20] Contrary to Simons's argument, he did not previously
raise the issue addressed in <u>Booker</u>. Simons's sentence was
reversed on appeal because no finding was made by this court as
to the weight of the cocaine before applying a ten-year mandatory
minimum. That question does not implicate the issue raised in
<u>Booker</u>. Notably, Simons's earlier challenge based on <u>Apprendi</u>
argued simply that <u>Apprendi</u> should be applied retroactively and
never suggested that Simons had previously raised this issue.

U.S. 500 (2003) ("[Generally], claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice.").

The first of these claims contends that Simons's right to remain silent and right to counsel were violated when S/A Klein testified about Simons's request for an attorney. His second claim alleges that S/A Klein's testimony about the February 24, 1995 meeting violated the confrontation clause. These two arguments mirror Simons's ineffective assistance of counsel claims, which were previously denied. Just as Simons was unable to establish ineffective assistance of counsel on those claims, he is unable to show the cause and prejudice necessary to excuse his default. Moreover, in raising these additional claims, Simons fails to point to any additional facts to show cause. Similarly, petitioner is unable to show either cause or prejudice on the cumulative due process claim he raises.

## Conclusion

For reasons stated above, both Simons's recusal motion and his § 2255 motion are denied.  The Clerk of the Court will enter judgment accordingly and close the case.

Dated:     Brooklyn, New York
           June 28, 2007

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge